## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

DUCHESNAY INC. and DUCHESNAY
USA INC.,

     Plaintiffs,

v.

ACTAVIS LABORATORIES FL, INC.,
ACTAVIS, INC., and ACTAVIS
PHARMA INC.,

     Defendants.

Case No. 1:14-cv-00912-SLR

## DEFENDANTS' ANSWERING CLAIM CONSTRUCTION BRIEF

RICHARDS, LAYTON & FINGER, P.A.
Steven J. Fineman (#4025)
Jason J. Rawnsley (#5379)
920 North King Street
Wilmington, DE 19801
(302) 651-7700
fineman@rlf.com
rawnsley@rlf.com

*Attorneys for Defendants Actavis Laboratories FL
Inc., Actavis, Inc. and Actavis Pharma Inc.*

OF COUNSEL:

Chad A. Landmon (*pro hac vice*)
Jonathan A. Harris (*pro hac vice*)
Thomas K. Hedemann (*pro hac vice*)
AXINN, VELTROP &
HARKRIDER
90 State House Square
Hartford, Connecticut 06103
(860) 275-8100

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

    I.     Factual Background ........................................................................................ 2

          A.    DS-P ..................................................................................................... 3

          B.    Enteric Coatings ................................................................................. 4

          C.    Disintegrants ...................................................................................... 4

          D.    *In Vitro* Dissolution Profiles ............................................................ 5

          E.    In an Effort to Avoid Diclectin, the '695 Patent Touts Onset of Action. ... 5

ARGUMENT ................................................................................................................... 7

    I.     "Rapid Onset Formulation" ......................................................................... 8

          A.    The Intrinsic Record Defines Onset As the Start of Therapeutic Action. .. 8

               1.    The Ordinary and Customary Meaning of "Onset" Is Action in the Body. ............................................................................................... 8

               2.    Plaintiffs Cannot Walk Away from What the Patentee Told the PTO. ................................................................................................ 9

          B.    The Art-Recognized Definition of "Onset" Is an Important Question of Fact. ............................................................................................ 11

          C.    Plaintiffs' Proposed Construction Is Inconsistent With the Intrinsic Record. ............................................................................................. 12

    II.    "Dissolution Profile" ................................................................................... 15

          A.    The Patentee's Express Definition Controls. .................................. 16

          B.    Plaintiffs' Construction Violates Multiple Canons of Claim Construction. ................................................................................... 18

    III.    CONCLUSION ............................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accent Packaging, Inc. v. Leggett & Platt, Inc.,*
    707 F.3d 1318 (Fed. Cir. 2013)...............................................................................18

*Astrazeneca LP v. Apotex, Inc.,*
    633 F.3d 1042 (Fed. Cir. 2010).................................................................................18

*Bell Commc'ns Research, Inc. v. Fore Sys., Inc.,*
    113 F. Supp. 2d 635 (D. Del. 2000).........................................................................13

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)..........................................................................*passim*

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n,*
    511 F.3d 1132 (Fed. Cir. 2007).................................................................................16

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.,*
    135 S.Ct. 831 (2015)..............................................................................................7, 11

*Unique Concepts v. Brown,*
    939 F.2d 1558 (Fed. Cir. 1991)...................................................................................9

*Verizon Services Corp. v. Vonage Holdings Corp.,*
    503 F.3d 1295 (Fed. Cir. 2007).................................................................................11

## INTRODUCTION

The lone patent in this case, U.S. Patent No. 6,340,695 (the "'695 patent"), claims only a small and routine modification to the prior art Diclectin formulation that had been used to treat nausea and vomiting in pregnancy ("NVP") since 1975.  Just like Diclectin, the patented formulation, as recited by independent claim 1 of the '695 patent, includes the active ingredients doxylamine succinate and pyridoxine hydrochloride as well as identical inactive ingredients – a disintegrant and an enteric coating.  The '695 patent also reports *in vitro* dissolution profiles for Diclectin, and these profiles are highly similar to the *in vitro* dissolution profiles recited by claim 1 of the '695 patent.

Thus, in an effort to avoid Diclectin, the patentee told the Patent Office ("PTO") that Diclectin suffered from the drawback of "delayed onset of action," i.e., was too slow in providing relief from NVP, and that the claimed "rapid onset formulation" overcame this drawback by providing "urgent relief of symptoms."  Having secured issuance of the patent, Plaintiffs now attempt to walk away from what the patentee told the PTO about the real-world utility of the claimed formulations.  For litigation-inspired reasons, Plaintiffs seek instead to focus exclusively on the results of their *in vitro* dissolution testing conducted in a beaker outside the body.

Against that backdrop, the parties dispute two claim limitations.  Those limitations are "rapid onset formulation" and "dissolution profile/dissolution characteristics."

"Rapid onset formulation" means a formulation providing a rapid initiation of action (i.e., relief from symptoms) after transiting through the stomach.  Because both parties' proposed constructions repeat the claim terms "rapid" and "formulation," the key inquiry for the Court is the proper meaning of the word "onset."  The ordinary and customary meaning of the term "onset," in the context of the '695 patent, is the start or initiation of therapeutic action in the

body.  Not only that, "onset" is a term of art in the field of pharmaceutical formulation development, defined in exactly this same manner.

Perhaps recognizing these issues, Plaintiffs' construction – a formulation that rapidly releases the active ingredients at about pH 6.8 as shown by its in vitro dissolution profile – impermissibly erases "onset" from the claims and replaces it with "release."  "Onset" and "release" are different words with different meanings, and Plaintiffs provide no basis for defining the term of art "onset" in this manner.  Nor does the intrinsic record provide a basis for swapping one for the other.  Furthermore, and crucially, Plaintiffs' construction ignores the stated goal of the alleged invention – to overcome the "delayed onset of action" ascribed to Diclectin and thereby provide urgent relief to pregnant women suffering from morning sickness.

The disputed "dissolution" claim limitations should be construed exactly as the patentee expressly defined them in the specification.  It is black letter law that a patentee can be his or her own lexicographer by clearly and expressly defining a claim term, and that is precisely the case here.  Plaintiffs not only fail to mention that the patentee provided its own express definition, but they copy that definition to the letter, save for slipping in the word "average."  Plaintiffs cite no legal precedent authorizing such a modification to an express definition.  Nor does the rest of the intrinsic record somehow compel the modification.  On the contrary, the specification reports results of both individual and average dissolution runs, and precludes an artificial limitation based on an average.  Plaintiffs thus improperly read the term "average" into the claims and exclude numerous embodiments of dissolution results.

I.      FACTUAL BACKGROUND

The '695 patent includes 30 claims.  Claim 1, the sole independent claim, is representative:

1.  An enterically-coated pyridoxine HCl and doxylamine succinate rapid onset formulation comprising a disintegrating agent such that the following dissolution profiles are satisfied when measured in 1000 ml phosphate buffer at pH 6.8 and 37° C in a type 2 dissolution apparatus at 100 rpm:

(a) at least about 40% of the total amounts of each of pyridoxine HCl and doxylamine succinate are dissolved after 30 minutes of measurement;

(b) at least about 70% of the total amounts of each of pyridoxine HCl and doxylamine succinate are dissolved after 60 minutes of measurement;

(c) at least about 80% of the total amounts of each of pyridoxine HCl and doxylamine succinate are dissolved after 90 minutes of measurement;

(d) at least about 90% of the total amounts of each of pyridoxine HCl and doxylamine succinate are dissolved after 120 minutes of measurement.

The parties have agreed that the preamble is limiting.  (Pls.' Br. 7.)  Thus, all claims of the '695 patent are directed to a "rapid onset formulation" comprising three components: (1) the active ingredients doxylamine succinate and pyridoxine hydrochloride or "DS-P" for short; (2) an enteric coating; and (3) a disintegrant.  According to the '695 patent, the combination of these components produces "specific *in vitro* dissolution profiles indicative of a 'rapid onset' of the active ingredients."  (Ex. 1; '695 patent, col. 2, ll. 13-15.)[1]

A.     DS-P

DS-P includes the combination of an allegedly synergistic duo of active ingredients - the antihistamine doxylamine succinate and vitamin B6, also known as pyridoxine hydrochloride. This duo has long been known to treat NVP.  (Ex. 1; '695 patent, col. 1, ll. 63-65.)

At the time the application leading to the '695 patent was filed, on June 21, 2001, the use of DS-P to treat NVP had been known for close to fifty years.  On July 30, 1956, FDA approved Bendectin.  (Ex. 2; FDA Approved Drug Products: Bendectin, http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm (last visited July 14, 2015).)

---

[1] All exhibit references correspond to the Declaration of Thomas K. Hedemann, filed herewith.

Diclectin was sold in Canada as early as 1975 and, just like Bendectin, included a core of DS-P surrounded by a coating.  (Ex. 3; Raafat Bishai et al., *Critical Appraisal of Drug Therapy for Nausea and Vomiting of Pregnancy: II. Efficacy and Safety of Diclectin (Doxylamine-B6)*, 7 Canadian J. Clinical Pharmacology, 138 at 139 (2000).)

The '695 patent, at Example 3, discloses Diclectin as admitted prior art, providing its formulation details (core and coating) and *in vitro* dissolution profiles.   (Ex. 1; '695 patent, col. 7, l. 45 – col. 8, l. 50.)   The Background section of the '695 patent goes to great lengths to distinguish Diclectin from the claimed formulations.  (*Id.* col. 1, ll. 25-66.)

B.    Enteric Coatings

An enteric coating is a coating that limits or precludes release of active ingredients in the stomach, but allows release in the small intestines. The '695 patent, col. 3, ll. 29-34, expressly defines enteric coating in this way and the parties have agreed upon this definition.  (Pls.' Br. 7.)

One reason for avoiding drug release in the stomach, especially in pregnant women with NVP, is to prevent nausea and vomiting caused by a drug's irritation of the stomach's lining.  Thus, prior art formulations of Diclectin always included an enteric coating surrounding the DS-P core.  According to the '695 patent, Diclectin's enteric coating was C.A.P. or cellulose acetate phthalate.  (Ex. 4; Felton Decl. ¶ 12 (citing Ex. 1; '695 patent, col. 8, ll. 9-11).)

C.    Disintegrants

Disintegrants typically reside in the cores of pharmaceutical formulations and facilitate the break-up of a tablet after its protective coating, in this case its enteric coating, dissolves.  The '695 patent discloses several examples of disintegrants, one of which is microcrystalline cellulose – "[e]xamples of disintegrating agents include . . . microcrystalline cellulose." (Ex. 1; '695 patent, col. 3, ll. 60-64.)  The '695 patent further discloses and admits that the core of Diclecltin included microcrystalline cellulose.  (*Id.* col. 7, ll. 60-61.)

D.    *In Vitro* Dissolution Profiles

*In vitro* dissolution profiles are used to determine the release rates of active ingredients from dosage forms, e.g., tablets, in a beaker outside the body.  (Ex. 4; Felton Decl. ¶ 3.)  In this case, the '695 patent reports *in vitro* dissolution profiles for the claimed formulations.  (Ex. 1; '695 patent, tbls.3 & 6.)  The '695 patent also reports *in vitro* dissolution profiles for Diclectin, and these profiles are highly similar to the dissolution profiles recited by claim 1 of the '695 patent:

| Claim 1 Dissolution Profile | Prior Art Diclectin |
|---|---|
| "at least about 40% after 30 minutes" | Pyrodixine HCl – 32%<br>Doxylamine – 31% |
| "at least about 70% after 60 minutes" | Pyrodixine HCl – 56%<br>Doxylamine – 56% |
| "at least about 80% after 90 minutes" | Pyrodixine HCl – 73%<br>Doxylamine – 69% |
| "at least about 90% after 120 minutes" | Pyrodixine HCl – 84%<br>Doxylamine – 75% |

(*Compare* Ex. 1; '695 patent, claim 1 *with id.* tbl.9, Run 3.)

E.    In an Effort to Avoid Diclectin, the '695 Patent Touts Onset of Action.

Because prior art Diclectin formulations included all of the components recited by the originally-filed independent claim of the '695 patent, including (1) DS-P; (2) an enteric coating; and (3) a disintegrant, as well as highly comparable *in vitro* dissolution profiles, the patentee also touted its alleged invention as providing important biological advantages – a rapid onset of action in the body relative to Diclectin.  The term "onset," in the field of pharmaceutical formulation development, refers to the start or initiation of therapeutic action in the body after administration.  (Ex. 4; Felton Decl. ¶¶ 7-8.)

"Onset" is a term of art well-known to those of ordinary skill.  (*Id.* ¶ 8.)  Literature

published around the time of the '695 patent defines "onset" as the start or beginning of

therapeutic action.  The text *Pharmaceutics, The Science of Dosage Form Design* states:

> The *onset* may be defined as the time required to achieve the minimum effective
> plasma concentration following administration of the dosage form.

(Ex. 5; *Pharmaceutics, The Science of Dosage Form Design* at 176 (Michael E. Aulton ed.,

1988) at 264 (Michael E. Aulton ed., 2d ed. 2002).)  The minimum effective plasma

concentration is, in turn, defined as the minimum amount of drug in the blood to achieve the

desired therapeutic effect.  (*See id.*)  Similarly, in discussing the onset of various drug

substances, from sedatives to insulin, the literature characterizes "onset" as therapeutic action

within the body.  (Ex. 4; Felton Decl. ¶ 10 (citing Ex. 6; *Goodman & Gilman's The*

*Pharmacological Basis of Therapeutics* at 417, 608, 1693 (10th ed. 2001)).)

Further, to gain allowance of its claims, the patentee told the PTO that the claimed

formulations provide more rapid relief from symptoms than Diclectin.  The Background of the

'695 patent specification states that Diclectin "suffers from drawbacks, one of which being its

delayed onset of action."  (Ex. 1; '695 patent, col. 1, ll. 26-28.)  The specification almost

immediately thereafter characterizes this delay as too long for pregnant women seeking urgent

relief from NVP symptoms:

> the current formulation [Diclectin] once ingested, can take more than 4 hours
> before the two active ingredients (pyridoxine HCl and doxylamine succinate)
> reach nearly full dissolution in the small intestines, where it is absorbed.  <u>This
> delay is often considered too long for patients, such as women suffering from
> NVP, who require urgent relief of symptoms.</u>

(*Id.* col. 1, ll. 31-34 (emphasis added).)

Having thus characterized the drawback of Diclectin as "delayed onset of action," the

specification expressly asserts that the "present invention" overcomes this drawback.  According

to the specification, "the main challenge surmounted by the present invention was to arrive at a dosage form capable of overcoming the drawbacks of the prior art." (*Id.* col. 1, ll. 63-66.)

Given the foregoing, the PTO allowed the claims on first action, without issuing any Office Actions. There is thus no prosecution history that bears on claim construction here.

## ARGUMENT

This Court is familiar with the framework for claim construction set out by the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), and Defendants ("Actavis") will not repeat the general principles here. It bears noting, however, that the Supreme Court recently highlighted the importance of recourse to extrinsic evidence for terms of art, whose definitions are subject to a fact-finding exercise entitled to deference:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

See *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 841 (2015) (internal citation omitted). Thus, when the meaning of a term of art is in issue, extrinsic evidence can help inform and potentially govern the claim construction analysis. *See id.* at 841-42 ("[I]n some instances, a factual finding may be close to dispositive of the ultimate legal question of the proper meaning of the term in the context of the patent."). This is especially true for technical terms of art. *See id.* (when defining a highly technical term of art in a written instrument, "determination of the matter of fact will precede the function of construction") (internal quotations omitted).

In this case, the parties have agreed to the construction of various claim limitations, and those limitations along with their agreed-upon constructions correctly appear in Plaintiffs'

Opening Brief.  (Pls.' Br. 7.)  Two disputed claim limitations – "rapid onset formulation" and

"dissolution profiles/characteristics" remain.  Actavis will address each in turn.

I.      "RAPID ONSET FORMULATION"

| Claim Term | Duchesnay's Proposed Construction | Actavis' Proposed Construction |
|---|---|---|
| rapid onset formulation | a formulation that rapidly releases the active ingredients at about pH 6.8 as shown by its in vitro dissolution profile | a formulation providing a rapid initiation of action (i.e., relief from symptoms) after transiting through the stomach |

Because both parties repeat the terms "rapid" and "formulation" in their proposed

constructions of "rapid onset formulation," proper interpretation of this disputed claim limitation

hinges on the term "onset."  (Ex. 4; Felton Decl. ¶ 11.)  Not only does the '695 patent

specification implicitly define "onset" as the start or initiation of therapeutic action, the extrinsic

evidence makes clear that "onset" is a term of art and defines it in this same manner as a matter

of fact.

A.      The Intrinsic Record Defines Onset As the Start of Therapeutic Action.

The intrinsic evidence defines "onset" to mean the start of therapeutic action in the body.

The '695 patent specification, which represents the only intrinsic evidence of record, repeatedly

refers to the term "onset" as onset of action in the body, not in a beaker.  Further, a full

understanding of the alleged invention reveals that the patentee regarded its true inventive

concept as overcoming the delayed onset of Diclectin to provide "urgent relief of symptoms."

The Court should not permit the patentee to walk away from these representations.

1.      The Ordinary and Customary Meaning of "Onset" Is Action in the Body.

Context surrounding the term "onset" in the '695 patent demonstrates that the term

"onset" means initiation of therapeutic action within the body.  In its Background, for example,

the '695 patent criticizes Diclectin as suffering from a "delayed onset of action."  (Ex. 1; '695

8

patent, col. 1, ll. 27-28.)  The Background states "this delay is often too long for patients such as women suffering from NVP, who require urgent relief of symptoms."  (*Id.* col. 1, ll. 31-34.) Similarly, at the end of the Detailed Description, the specification states "a slower *in vivo* dissolution [in the body] is indicative of a delayed onset of action," but that the claimed formulations overcome this problem by exhibiting "a rapid onset of action."  (*Id.* col. 8, ll. 55, 57.)  The most and only sensible reading of this passage is that slow dissolution within the body indicates delayed relief from symptoms in the body after administration.

The specification further reinforces the notion that onset corresponds to relief from symptoms within the body by characterizing rapid release within a patient's intestines as critical: "the novel oral formulation <u>must</u> . . . rapidly release both active ingredients once the dosage form reaches its intended destination, namely the intestines."  (*Id.* col. 1, ll. 59-61 (emphasis added); *see also id.* col. 4, ll. 64-67.)  The only reason rapid absorption in the intestines is important is to make the active ingredients available in the body for relief from symptoms.  (*Id.* col. 1, ll. 28-34.)  Otherwise, the claimed formulations would offer no added benefit to pregnant patients suffering with NVP versus Diclectin.  These passages thus demonstrate that the '695 patentee regarded rapid relief from symptoms in the body as its true invention.  (Ex. 4; Felton Decl. ¶ 16.)

Of course, all of this context surrounding "onset" in the '695 patent specification is consistent with its meaning as a term of art.  That is, the customary and ordinary meaning of "onset" in the context of the '695 patent aligns with Actavis' construction.

2.     <u>Plaintiffs Cannot Walk Away from What the Patentee Told the PTO.</u>

Further, this Court should require Plaintiffs to live with the patentee's representation to the PTO that rapid relief from symptoms within the body distinguishes the "present invention" from Diclectin.  "Claims may not be construed one way in order to obtain allowance and in a different way against accused infringers."  *Unique Concepts v. Brown*, 939 F.2d 1558, 1562

(Fed. Cir. 1991).  That is why *Phillips* mandates that reviewing courts align claim construction with the patent's description of the alleged invention:

> Ultimately, the interpretation to be given to a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316 (citation omitted).

Conveniently, the Background of the '695 patent provides that understanding.  The Background expressly describes the purpose of the "present invention" as overcoming the allegedly "delayed onset of action" associated with Diclectin, which it characterizes as an alleged drawback of the prior art:

| Diclectin's Alleged Drawback | Present Invention "Overcomes" Drawback |
|---|---|
| "Diclectin is the drug of choice for the treatment of NVP.  The current formulation . . . suffers from drawbacks, one of which being its delayed onset of action.  However, the current formulation once ingested, can take more than 4 hours before the two active ingredients (pyridoxine HCl and doxylamine succinate) reach nearly full dissolution in the small intestines, where it is absorbed.  This delay is often considered too long for patients, such as women suffering from NVP, who require urgent relief of symptoms."  (Ex. 1; '695 patent, col. 1, ll. 25-34.) | "The main challenge surmounted by the present invention was to arrive at a dosage form capable of overcoming the drawbacks of the prior art. . . ."  (Ex. 1; '695 patent, col. 1, ll. 63-66.) |

The Background begins by explaining that the "present invention relates to a rapid onset formulation" for the treatment of NVP.  (Ex. 1; '695 patent, col. 1, ll. 6-12.)  It then admits that Diclectin already exists and is the drug of choice for NVP.  (*Id.* ll. 23-25.)  Because Diclectin includes all of the same components as independent claim 1, and a very close *in vitro* dissolution profile, the Background attempts to distinguish it as suffering from the drawback of "delayed

10

onset of action." (*Id.* col. 1, ll. 27-28.)  It states this delay is often considered too long for

patients "who require urgent relief of symptoms." (*Id.* col. 1, ll. 31-34.)  Having identified the

alleged drawback of Diclectin as delayed onset, the Background then characterizes the purpose

of the "present invention" as allegedly overcoming this drawback. (*Id.* col.1, ll. 63-66); *see*

*Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)

(holding that use of the phrase 'present invention' "limits the scope of the invention").  Later, the

specification states that the claimed formulations overcome the drawback of slow "*in vivo*

dissolution" (i.e., dissolution within the body) through rapid onset of action. (*Id.* col. 8, ll. 54-

59.)  In all of these ways, the specification implicitly defines "onset" as relief from symptoms.

Accordingly, this Court should not permit the patentee to trumpet its claimed

formulations as accelerating relief from debilitating episodes of NVP to the Patent Office, and

then cast these statements aside because they are inconvenient in litigation.  Further, and along

these same lines, if the formulations claimed by the '695 patent simply accelerate *in vitro*

dissolution outside the body without actually providing rapid relief from symptoms inside the

body, the '695 patent would have no practical real-world utility.  The term "rapid onset

formulation" means a formulation providing rapid initiation of action (i.e., relief from symptoms

by DS-P).

B.    The Art-Recognized Definition of "Onset" Is an Important Question of Fact.

To the extent the Court has any question about the parties' respective definitions of

"onset," the Court may of course elect to engage in subsidiary fact-finding through recourse to

extrinsic evidence. *Teva*, 135 S.Ct. at 837-38 & 841.  Such subsidiary fact-finding reveals the

11

art-recognized definition of "onset" in the field of pharmaceutical formulation development as the start or initiation of therapeutic action.[2] Plaintiffs never claim otherwise.

Indeed, both the 1988 and 2002 versions of the text "Pharmaceutics, the Science of Dosage Form Design" expressly define "onset" as "the time required to achieve the minimum effective plasma concentration following administration of the dosage form," i.e, time to minimum therapeutic effect. (Ex. 5; *Pharmaceutics, The Science of Dosage Form Design* at 176 (Michael E. Aulton ed., 1988) at 264 (Michael E. Aulton ed., 2d ed. 2002); Ex. 4; Felton Decl. ¶ 9.) Other literature dated at the time of the '695 patent likewise demonstrates that those of ordinary skill define onset in this way. (Ex. 4; Felton Decl. at ¶ 9.) Plaintiffs' own label for the commercial embodiment of the '695 patent, Diclegis, makes clear that "onset" refers to effects within the body: "[a] food-effect study demonstrated the delay in the onset of action of DICLEGIS may be further delayed, and a reduction in absorption may occur when tablets are taken with food." (Ex. 8; Diclegis Label at p. 5.)

C.   Plaintiffs' Proposed Construction Is Inconsistent With the Intrinsic Record.

Plaintiffs' proposed construction, by contrast, is inconsistent with the intrinsic record. First, it impermissibly reads the term "onset" out of the claims. Regardless of context, "onset" is the beginning or commencement of something. Yet, Plaintiffs' construction refers only to rapid release shown by an *in vitro* dissolution profile without regard to when it starts. Second, Plaintiffs' construction renders meaningless the patentee's representation to the PTO that the claimed formulations overcome the delayed onset of action allegedly attributable to Diclectin. Third and finally, Plaintiffs quote selected snippets of the patent specification out of context and

---

[2] Dictionaries generically define "onset" as the beginning or commencement. (Ex. 7; Merriam-Webster's Collegiate Dictionary. 10th ed. Springfield, Mass., (1998).) This begs the question of how one or ordinary skill would understand "onset" in its technical usage, as is the case here.

misinterpret the meaning of other passages.  The Court should, therefore, reject Plaintiffs'
proposed construction.

Plaintiffs' proposed construction – "a formulation that rapidly releases the active
ingredients at about pH 6.8 as shown by its in vitro dissolution profile" – rewrites the claims by
reading out the term "onset."  It is axiomatic, however, that "[e]ach and every word in a claim
must have meaning and cannot be ignored." *Bell Commc'ns Research, Inc. v. Fore Sys., Inc.*,
113 F. Supp. 2d 635, 653 (D. Del. 2000) (citation omitted).  Plaintiffs cannot seriously dispute
that "onset" means the start or beginning of something.  Plaintiffs' proposed construction fails,
however, to mention and, in fact, ignores starting time entirely.  Under Plaintiffs' construction,
the claimed formulation need only release in accordance with some unspecified dissolution
profile regardless of whether the starting time for release is considered rapid to one of ordinary
skill.  Plaintiffs' construction, for example, is open to formulations that dump the active
ingredients within minutes after delaying initial release for five or more hours.  "Onset" and
"release" are different words with different meanings to one of ordinary skill.  There is no basis
to substitute one for the other.

Further, Plaintiffs' construction renders meaningless the '695 patent's representation that
the claimed formulations overcome Diclectin's alleged drawback of delayed onset.  (Ex.1; '695
patent, col. 1, ll. 27-28.)  Comparing Tables 6 and 9, which respectively report the dissolution
profiles of an example of the claimed formulations and Diclectin, both start or initiate dissolution
at the 15 minute mark.  In other words, there is no distinction between the start or initiation of
dissolution between one of the claimed formulations (Table 6) on the one hand and Diclectin
(Table 9) on the other.

13

Plaintiffs' proposed construction also renders the words "rapid onset" redundant because it parrots claim language already recited by the body of the claims. Plaintiffs' proposed construction calls for a formulation that rapidly releases the active ingredients at about pH 6.8, as shown by its *in vitro* dissolution profile. Various claims, however, already require rapid release of active ingredients at pH 6.8, as measured by *in vitro* dissolution profiles. For example, claim 3 recites releasing at least about 40% within 5 minutes. If rapid onset means rapid dissolution, as Plaintiffs contend, there would be no need to independently recite "rapid onset" as a claim limitation.

Further, many of the passages Plaintiffs rely upon support Actavis. Plaintiffs find significance in the description of the prior art formulation as taking more than 4 hours to "reach nearly full dissolution in the intestines, where it is absorbed." (Pls.' Br. 10 (quoting '695 patent, col. 1, ll. 26-34).) The purpose of absorption in the intestines is to provide relief from symptoms, as the specification explicitly states in the very next line, where it explains that the "delayed onset of action" is too long for patients "who require urgent relief from symptoms." ('695 patent, col. 1, ll. 32-33.) Plaintiffs' version of the quoted passage snips this important clarification. (Pls.' Br. 10.)

Plaintiffs also quote a number of passages stating that the claimed dissolution profiles are "indicative of" a rapid onset. (Pls.' Br. 11-12.) The term "indicative" signifies that one thing is a sign of another, e.g., an inability to concentrate and pay attention is indicative of attention deficit disorder. Plaintiffs' construction thus creates an unjustified redundancy – namely, that the *in vitro* dissolution profiles featured in the '695 patent specification are indicative of the very same *in vitro* dissolution profiles. What these passages really mean is that the dissolution

profiles disclosed by the '695 patent are indicative of something else, and that something else is rapid relief to pregnant women suffering with NVP (i.e., urgent relief from symptoms).

Finally, Plaintiffs' heavy reliance on the claim language is misplaced. The fact that the claims recite *in vitro* dissolution profiles does not mean that the phrase "rapid onset" somehow corresponds to *in vitro* results. To the contrary, it means that these are different terms with different meanings. The claims support Actavis, not Plaintiffs. Plaintiffs further argue that Actavis' construction is incorrect because it imports a timing or temporal element into the claims. (Pls.' Br. 8-9.) But the term "onset" is recited expressly by the claims and means the start or beginning of something, which is all Actavis' proposed construction requires.

In sum, both the '695 patent and the art define "onset" as rapid initiation of therapeutic action. Adoption of this definition not only aligns with the canons of claim construction announced by the Supreme Court and Federal Circuit, it ties the patentee to the representations it made to the PTO to get its claims allowed. The Court should reject Plaintiffs' request to walk away from these representations and divorce the alleged invention from any real-world efficacy.

II.     "DISSOLUTION PROFILE"

| Claim Term | Duchesnay's Proposed Construction | Actavis' Proposed Construction |
|---|---|---|
| dissolution profile / dissolution characteristics | average results of dissolution testing in which the amount of pyridoxine HCl and doxylamine succinate released is measured in 1000 ml phosphate buffer at pH 6.8 and 37° C using a USP (United Stated Pharmacopeia) type 2 dissolution apparatus at 100 rpm | results of a dissolution test in which the amount of pyridoxine HCl and doxylamine succinate released is measured in 1000 ml phosphate buffer at pH 6.8 and 37° C using a USP (United Stated Pharmacopeia) type 2 dissolution apparatus at 100 rpm |

It is well-settled that a patentee may act as its own lexicographer by using the patent specification "as a dictionary to expressly define terms used in the claims." *Phillips*, 415 F.3d at

1316. That is the situation here. The '695 patent expressly and unambiguously defines "dissolution," and that express definition should control. While Plaintiffs cite extensively to *Phillips*, they ignore this principle. This Court should reject Plaintiffs' litigation-driven request to deviate from the patentee's express definition by injecting the word "average" into the claims.

A.    The Patentee's Express Definition Controls.

The Federal Circuit has repeatedly held that "a definition set forth in the specification governs the meaning of the claims." *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138 (Fed. Cir. 2007). Seminal Federal Circuit decisions on claim construction endorse this principle. *See e.g., Phillips*, 415 F.3d at 1321 ("The specification 'acts as a dictionary when it expressly defines terms.'").

It is only in the unique case where the express definition is incomplete or inconsistent with the remainder of the specification that courts may modify or deviate from it. *See Sinorgchem*, 511 F.3d at 1138 ("[W]hen the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term"). In *Sinorgchem*, the Federal Circuit rejected a lower court's revision of an express definition because the definition was neither incomplete nor inconsistent with the intrinsic record. *Id.*

So too here. In this case, the patentee clearly and expressly defined all claim limitations relating to or referencing a "dissolution profile" as follows:

> In the present invention, any reference to dissolution profile should be construed as referring to the results of a dissolution test in which the amount of pyridoxine HCl and of doxylamine succinate released is measured in 1000 ml phosphate buffer at pH 6.8 and 37° C, using a USP (United States Pharmacopeia) type 2 dissolution apparatus at 100 rpm; preferably measured by high performance liquid chromatography.

('695 patent, col. 3 ll. 21-28.)  Because a more express definition is difficult to imagine, this passage should end the inquiry.  Not only does the passage begin with "the present invention," thus demonstrating the patentee's clear intention to expressly define the recited claim terms, but it goes on to declare that "any reference to dissolution profile <u>should be construed</u>" as stated. (*Id.* (emphasis added).)  There can be no doubt that the patentee intended this definition to govern claim construction and that the term "results" covers both individual runs and an average.

Further, the express definition is both complete and entirely consistent with the '695 patent specification.  The express definition uses the term "results" without qualification to encompass both individual and average results.  The obvious reason for this word choice is that the specification refers to both individual and average results throughout and there is no mention of limiting the results to averages or in any way excluding individual runs.

Indeed, every time the '695 patent specification provides tables reporting the results of dissolution testing; it includes both individual runs and averages.  (Ex. 1; '695 patent, tbls. 3, 6 & 9.)  When introducing these Tables, the '695 patent repeatedly states "the numerical values are expressed as percentages of dissolved active ingredient in relation to starting quantities." (*Id.* col. 5, ll. 62-63; col. 7, ll. 4-5; col. 8, ll. 21-22.)   At one point, the specification even tries to explain away the results of certain individual runs as atypical.  (*Id.* col. 5, ll. 61-63.)  There would be no reason to offer such an explanation if the patentee regarded individual runs as irrelevant or falling outside the ambit of its claims.  The express definition is complete and consistent with the '695 patent specification.

To sidestep these problems, Plaintiffs fail to inform the Court of the express definition. Yet, Plaintiffs themselves recognize that the '695 patentee clearly intended to define the disputed limitations with the express definition.  With the exception of importing the word "average,"

17

Plaintiffs' proposed construction adopts the express definition wholesale. (*Compare* Plaintiffs'

Proposed Construction *with* Ex. 1; '695 patent, col. 3, ll. 21-27.)

Plaintiffs also fail to cite any precedent supporting introduction of their "average"

modifier. Instead, Plaintiffs ignore binding Federal Circuit precedent on the use of express

definitions in claim construction, including *Phillips*. The lone case Plaintiffs do cite is of no

help, as the disputed claim limitation in question there was not subject to an express definition.

(Pls.' Br. 14 (citing *Astrazeneca LP v. Apotex, Inc.*, 633 F.3d 1042 (Fed. Cir. 2010)).)

     B.    <u>Plaintiffs' Construction Violates Multiple Canons of Claim Construction.</u>

Plaintiffs' proposed construction also violates the canons of claim construction. First, it

impermissibly reads the term "average" into the claims. Second, it excludes embodiments

disclosed by the '695 patent specification.

Reading a limitation from the written description into the claims is "one of the cardinal

sins of claim construction." *See Phillips*, 415 F.3d at 1320. Here, neither the claim language nor

the specification's express definition mentions the term "average." The patentee could have

affirmatively recited the term average in its claims, for example, in connection with the percent

dissolved at each time interval, but chose not to. Similarly, the patentee could have introduced

the concept of an average into its express definition, as Plaintiffs have done in this litigation, but

passed on the opportunity. Plaintiffs are thus left asking this Court to impermissibly read the

term "average" into the claims and rewrite them. The Court should reject Plaintiffs' invitation.

Along these same lines, Plaintiffs' construction improperly excludes numerous

embodiments of dissolution profiles disclosed by the '695 patent specification from the scope of

the claims. *See Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir.

2013) ("a claim interpretation that excludes a preferred embodiment from the scope of the claims

is rarely, if ever, correct."). Each of Examples 1 and 2 includes individual runs that satisfy the dissolution profile of independent claim 1:

| Claim 1 Dissolution Profile | Example 1 (Run 1) | Example 2 (Run 4) |
| --- | --- | --- |
| at least about 40% after 30 minutes | Pyrodixine HCl – 95%<br>Doxylamine – 97% | Pyrodixine HCl – 63%<br>Doxylamine – 63% |
| at least about 70% after 60 minutes | Pyrodixine HCl – 95%<br>Doxylamine – 97% | Pyrodixine HCl – 89%<br>Doxylamine – 85% |
| at least about 80% after 90 minutes | Pyrodixine HCl – 95%<br>Doxylamine – 97% | Pyrodixine HCl –97%<br>Doxylamine – 88% |
| at least about 90% after 120 minutes | Pyrodixine HCl – 95%<br>Doxylamine – 97% | Pyrodixine HCl – 98%<br>Doxylamine – 96% |

(Ex. 1; '695 patent, tbls.3 & 6.)  In fact, nearly all of the individuals runs in both Examples 1 and 2 satisfy the dissolution profiles of claim 1.  If the Court adopts Plaintiffs' construction, the results of each of these individual runs will fall outside the scope of the claims.  There is no evidence the patentee intended such a result, and its attempt to justify the results of individual runs 1 through 3 in Table 3 belies any such assertion now.  (Ex. 1; '695 patent, col. 5, ll. 61-64.)

Accordingly, any and all results of dissolution testing conducted in accordance with the claimed parameters, whether individual or average, fall within the meaning of the disputed "dissolution" claim limitations.  This Court should simply adopt the express definition set forth by the '695 patent specification.

III.    CONCLUSION

For the foregoing reasons, Actavis requests that the Court adopt Actavis' proposed

constructions of disputed claim limitations.

Of Counsel:                                /s/ Steven J. Fineman
                                           Steven J. Fineman (#4025)
Chad A. Landmon                            Jason J. Rawnsley (#5379)
Jonathan A. Harris                         RICHARDS, LAYTON & FINGER, P.A.
Thomas K. Hedemann                         One Rodney Square
AXINN, VELTROP & HARKRIDER LLP             920 North King Street
90 State House Square                      Wilmington, DE 19899
Hartford, Connecticut 06103                (302) 651-7700
(860) 275-8100                             fineman@rlf.com
                                           rawnsley@rlf.com
Dated:  July 15, 2015
                                           *Attorneys for Defendants Actavis Laboratories
                                           FL Inc., Actavis, Inc. and Actavis Pharma Inc.*