IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DUCHESNAY INC. and DUCHESNAY USA INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 14-912 (SLR)(SRF) |
| ACTAVIS LABORATORIES FL, INC., ACTAVIS, INC., and ACTAVIS PHARMA, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

**DECLARATION OF STEPHEN R. BYRN, PH.D.**
**IN SUPPORT OF DUCHESNAY'S REPLY CLAIM CONSTRUCTION BRIEF**

I, Stephen R. Byrn, Ph.D., declare as follows:

1.      I have been retained by Finnegan, Henderson, Farabow, Garrett & Dunner LLP to provide my opinions regarding the meanings of certain claim terms in U.S. Patent No. 6,340,695 entitled "Rapid Onset Formulation" ("the '695 patent") in connection with the litigation pertaining to generic versions of Duchesnay's drug, Diclegis®.  I am being compensated at the rate of $650 per hour for my time in this case.  My compensation is not dependent in any way on the outcome of this case.

I.      BACKGROUND AND QUALIFICATIONS

2.      I obtained a BA in Chemistry, from DePauw University in 1966 and a PhD in Organic and Physical Chemistry from University of Illinois, Urbana in 1970.  I have been a post-doctoral fellow at University of California, Los Angeles, in the Department of Physical Chemistry from 1970 to 1972.

3.      I have been a Professor Medicinal Chemistry at the School of Pharmacy and Pharmaceutical Sciences of the Department of Industrial and Physical Pharmacy at Purdue University since 1972 (assistant, associate, and then full professorship).  I was made the Charles B. Jordan Professor of Medicinal Chemistry of that department in 1992.

4.      At Purdue University, I have been the Associate Department Head of Medicinal Chemistry (1979-1988) and then the Head (1988-1994) of the Department of Medicinal Chemistry and Pharmacognosy of the School of Pharmacy and Pharmaceutical Sciences.  Then, I have been the Head of the Department of Industrial and Physical Pharmacy of that school from 1994-2009.  I have also been the Assistant Dean of the Graduate School of Purdue University from 1984 to 1988.

5.      I am the Founder and have been the Director (in 1988) of the Purdue University Center for AIDS Research.

6.      I specialize in solid state chemistry of drugs and formulation design; the study of polymorphs, nanoparticles, liquid crystals, cocrystals, and amorphous materials, analytical methods in the solid state including X-ray diffraction and solid state NMR; and the molecular basis of manufacturing.  This solid state research has implications for formulation design, the analysis of drugs, the stability of drugs, the control of drug manufacturing, and the development of methods of crystallization. By carrying out research on the solid state chemistry of drugs it is hoped that new approaches for drug analysis including X-ray PDF methods and solid state NMR methods will be developed. Finally, all of this information is used to develop new formulations that provide equivalent bioavailability of marketed drugs at reduced dose.  Research is also ongoing to develop new formulations and manufacturing technologies to increase access to medicines in Africa.

7.      My current research projects include formulation design for reduced dose formulations; formulation design strategies to accelerate drugs to proof of concept and for translational research; nanoparticle preparation and analysis, synchrotron methods to screen for amorphous formulations; preparation, crystallization, and scale-up of cocrystals; and molecular basis of manufacturing.

8.      I have worked on dissolution of molecules for which dissolution determines the blood levels for many years.  I referred to dissolution tests in my 1982 book on Solid State Chemistry of Drugs.  Currently our laboratory is performing many dissolution tests of compounds for which the rate and amount of dissolution determines blood levels.

9.      I served as an elected member of the USP (United States Pharmacopeia) from 1990 to 2005.  During this time I served on various USP committees.  During this entire period I was chair of a committee that approved USP monographs for Drug Substances and Drug Products.  Typically, this committee would deal with over 400 monographs.  I also served on the Dissolution and Bioavailability Subcommittee and other subcommittees during this period.  Since 2005 I have been Purdue's representative to the USP general convention.

10.      I have supervised more than 40 graduate students in my research laboratory.  I have taught several graduate and post-graduate courses in the pharmaceutical field.  These courses focused on formulation design including the design of formulations with enhanced bioavailabilty and rapid onset.  I have also taught courses and given lectures on coating and enteric coatings.  I have also taught courses on drug analysis, regulatory science and manufacturing.  I have taught many of these courses in our Sustainable Medicines in Africa program in Tanzania.  I have published more than 160 publications in that field as well as books and book chapters.  I have presented and/or co-authored a large number of papers and given many invited lectures and symposiums, talks, seminars and courses in that field.

11.      I have received several awards and honors including the AAPS David Grant Research Achievement Award in Physical Pharmacy.  I am a Fellow of the AAPS and in 2010, a special issue of the *Journal of Pharmaceutical Sciences* was dedicated to me, based on my contributions to the field of solid state pharmaceuticals.

12.      Since 1975, I have had numerous consultantships with pharmaceutical companies (including Novartis, Pfizer, BMS, J&J, Wyeth, Lilly, Roche, Abbott, Watson, and Merck and many others).

13.     I am the Co-Founder and Study Director (1991-2006) of SSCI, a research and information GMP contract research firm employing about 90 people.  SSCI was sold to Aptuit in 2006.  I have been a consultant to Aptuit since 2009.

14.     A copy of my curriculum vitae is attached as Exhibit A.

15.     Based on my education and experience, I am qualified to address the issues discussed in this report.

16.     I have been advised that the claim terms of the '695 patent have the meaning that the terms would have in the context of the patent as a whole to a person of ordinary skill in the field of pharmaceutical formulation development in June 2001.  I have applied that understanding in forming my opinions.

17.     I have been asked to give my opinion about the meaning of the terms "rapid onset formulation" and "dissolution profile" and "dissolution characteristics" in the '695 patent.

18.     I have reviewed the '695 patent.  I have also reviewed the Declaration of Linda Felton, Ph.D. in Support of Defendants' Answering Claim Construction Brief and the accompanying exhibits.  I understand that I am to interpret claims of the '695 patent from the perspective of one of ordinary skill in the art as of June 21, 2001.

19.     I understand that Duchesnay has defined one of ordinary skill in the art as follows:

> a person having knowledge of pharmaceutical formulation and drug delivery systems, who has a Ph.D., a Pharm.D., a Master's degree, or a Bachelor's degree in pharmacy or a related science and some years of experience in pharmaceutical formulation.   One

of skill in the art would have knowledge of pharmaceutics, including knowledge of delayed and immediate release dosage forms, enteric coatings, basic pharmacokinetics, and dissolution testing. He or she would also know that for oral dosage forms, drug dissolution at the intended delivery site is a prerequisite to the uptake of drug into the blood stream and its subsequent transport to the receptor site in patient's body.

20.    I agree with this definition of one of ordinary skill in the art as it pertains to the '695 patent.

## II.    DISSOLUTION TESTS AND THEIR ROLE IN PHARMACEUTICAL FORMULATION DEVELOPMENT

21.    In the context of the '695 patent, "dissolution" refers to a material (e.g., an active pharmaceutical ingredient) going from an undissolved solid particulate state to a solubilized state in a liquid solvent (e.g., the intestinal fluid or aqueous media having a pH of 6.8 in the case of an enterically coated tablet). A drug must be dissolved before it can be absorbed by the intestines.

22.    The term "phosphate buffer at pH 6.8" which appears in the '695 patent is a simulated intestinal fluid. It is a solution of phosphate salts in a ratio that will result in a pH of 6.8. This solution mimics the normal human intestinal pH and is typically used to test dissolution of enteric coated tablets to simulate dissolution in the human intestines.

23.    The term "Type 2 apparatus" also appears in the '695 patent and refers to the dissolution testing equipment approved by the United States Pharmacopeia ("USP"). The apparatus is designed to test six tablets at a time.

24.    The '695 patent claims specific and faster dissolution rates than the previously known formulations of doxylamine succinate and pyridoxine hydrochloride.

- 5 -

25.     Dissolution testing is commonly used to compare different formulations of the same active ingredient(s), to see if changes in a formulation affect its dissolution rate.  For oral tablets, dissolution is a prerequisite to drug absorption (entry into the bloodstream).  USP dissolution testing is an *in vitro* test in the sense that it does not require administering the formulation to human subjects. But is it the best non-invasive way to predict dissolution in a human body.

## III.   "RAPID ONSET FORMULATION"

26.     One of skill in the art would immediately understand that the '695 patent describes a new and improved formulation comprising the active ingredients doxylamine succinate and pyridoxine hydrochloride for treating vomiting and nausea, especially that associated with pregnancy, and that the improved formulation shows faster intestinal dissolution than the previous formulation.   That is said by the patentee to be indicative of "rapid onset."

27.     In my opinion, the term "rapid onset formulation" in the claims of the '695 patent refers to a formulation providing rapid initiation of action after transiting through the stomach, as shown by its *in vitro* dissolution profile.  In the context of the '695 patent, the term "rapid onset" is not measured by assessing the timing of "relief from symptoms" but instead is determined by the dissolution profile of the claimed pharmaceutical formulations.

28.     One of ordinary skill in the art would appreciate that the claimed pharmaceutical formulations are enteric-coated; in fact, it is even required by the claims.  One of skill in the art would know that the term "enterically-coated" means a coating placed on a dosage form, in this case a tablet, to shield the tablet while transiting through the stomach so that it can dissolve in the intestines.  Enteric coatings work by being impermeable at the low pH (acidic) environment

of the stomach and permeable at the higher pH (less acidic, neutral, or basic) environment of the intestines.

29.     As the term "rapid onset" is used in the '695 patent within the context of an enteric-coated formulation it is, by definition, a delayed-release formulation.  Thus, one of ordinary skill in the art would know that the patentee intended to convey the notion that the onset is "rapid" once the tablet reaches its intended delivery site and releases its active ingredients to dissolve in the intestines:

> However, since DS-P is orally delivered as an enteric coated tablet, the novel oral formulation must transit through the stomach unscathed and rapidly release both active ingredients once the dosage form reaches its intended designation, namely the intestines.

('695 patent, col. 1, ll. 58-62.)

30.     Thus, one of ordinary skill in the art would understand that the invention relates to a faster dissolution, hence a faster onset of action, once it reaches the intestines.  He or she would also understand that, in the context of the '695 patent, the onset of the patent formulation is faster than that of the prior art formulation described in the '695 patent specification because, as explained by the inventor, of the faster dissolution as shown by in-vitro testing:

> It follows from these results that the prior art formulation, exhibits a noticeably slower dissolution pattern when compared with the novel formulations.  Indeed, after 90 minutes averages of only 60% doxylamine and 67% pyridoxine HCl are dissolved.  A slower in-vivo dissolution profile is indicative of a delayed onset of action. The novel formulations, as depicted by examples 1 and 2, show markedly faster onset dissolution profiles resulting in a rapid onset of action.

('695 patent, col. 8, ll. 50-57.)

31.     The relationship between dissolution and blood levels would have been readily apparent to one of skill in the art:  the faster the dissolution, the faster the absorption can take place and the faster the blood levels of drug(s) rise, eventually leading to faster therapeutic effects.  As a result, the rate of dissolution is a key target for controlling the effects of the active ingredients.[1]  Improved dissolution, as taught in the '695 patent, has a direct bearing on therapeutic effect.   For these reasons, one of ordinary skill in the art would understand that the improved dissolution profiles are an essential focus of the claimed invention.

32.     In this case, one of skill in the art would have considered the link between dissolution and therapeutic effect particularly strong because of the nature of the two active pharmaceutical ingredients.  One of ordinary skill in the art would have understood, as of 2001, that both active ingredients of the claimed formulations, doxylamine succinate and pyridoxine HCl, are readily soluble in water and are readily absorbed in the small intestines. THE MERCK INDEX, 13th Ed. (2001) (**Merck Index 2001**), Ex. 1[2] at 3479, 8075 (noting that doxylamine succinate and pyridoxine hydrochloride are water soluble); REMINGTON: THE SCIENCE AND PRACTICE OF PHARMACY, 19th Ed.  (1995) (**Remington 1995**), Ex. 2 at 1127, 1226 (same); REMINGTON: THE SCIENCE AND PRACTICE OF PHARMACY, 20th Ed. (2000) (**Remington 2000**), Ex. 3 at 1469, 1809-1810 (same); Bishai, R. et al., "Critical appraisal of drug therapy for nausea and vomiting of pregnancy II.  Efficacy and safety of Diclectin (doxylamine-B6)," Can. J. Clin. Pharmacol. Vol. 7 No. 3 Autumn 2000 (**Bishai 2000**), D.I. 48, Ex. 3 at 140 (noting both doxylamine succinate and pyridoxine HCl are readily absorbed in the intestines).

---

[1] This is true unless the drug is poorly absorbed.

[2] The exhibit numbering in this declaration corresponds to the exhibits attached to Plaintiffs' Reply Claim Construction Brief.

33.     The rates of release and dissolution, which are formulation-specific characteristics, are what determine the rate of absorption of the active ingredients, which in turn determines the time needed for achievement of effective plasma concentrations. Ansel, H. et al., PHARMACEUTICAL DOSAGE FORMS AND DRUG DELIVERY SYSTEMS, 7th Ed. (1999) (**Ansel 1999**), Ex. 4 at 113–15.  In other words, the dissolution time will directly impact absorption, concentration in the bloodstream, and eventual therapeutic action.  One of skill in the art would have understood that, when comparing different formulations of equal amounts of the same soluble, readily absorbed drug, a faster dissolution rate will necessarily translate into a more rapid influx of drug into the bloodstream.

34.     The claims and specification of the '695 patent focus on the dissolution characteristics of the active ingredients.

35.     Examples 1-3 of the '695 patent report *in vitro* dissolution test results for each of the formulations tested.  The formulations of Examples 1 and 2 of the '695 patent are "rapid onset formulations" as compared to the prior Diclectin® of Example 3 because of their faster rate of dissolution of active ingredients in the small intestine as measured by *in vitro* dissolution testing.

36.     Figure 1 of the '695 patent shows the improved rapid onset *in vitro* dissolution profiles of the formulations of the invention as compared to the prior Diclectin®.  The *in vitro* dissolution profiles shown in Figure 1 for the novel formulations of the '695 patent (Examples 1 and 2) are significantly faster than the *in vitro* dissolution profile for the prior Diclectin®.

37.     The '695 patent states: "A slower in-vivo dissolution profile is indicative of a delayed onset of action.  The novel formulations, as depicted by examples 1 and 2, show markedly faster onset dissolution profiles resulting in a rapid onset of action."  (col. 8, ll. 54–57.)

38.     The '695 patent ties the improved dissolution profile of the claimed formulations to "rapid onset" of action.  Examples of this include:

- "[T]he formulation exhibiting a dissolution profile indicative of a rapid onset." (col. 2, ll. 10–12);

- "The invention also seeks to provide a pharmaceutical composition having specific in-vitro dissolution profiles indicative of rapid onset of the active ingredients." (col. 2, ll. 13–15);

- "The first dissolution profile (example 1) corresponds to a rapid onset formulation from which nearly 100% of both active ingredients is released within 45 minutes. The second dissolution profile (example 2) corresponds to a rapid onset formulation from which approximately 95% of both active ingredients is released within 120 minutes." (col. 2, ll. 30–36);

- "This example [Example 2] demonstrates that the rapid onset feature of the formulation of the present invention was obtained with a different group of excipients." (col. 6, ll. 33–35; *see also* 7:5–39, showing improved dissolution characteristics);

- "[T]he novel formulation demonstrates a rapid onset as shown by its dissolution profile." (col. 7, ll. 32–34]); and

- "A slower in-vivo dissolution profile is indicative of a delayed onset of action." (col. 8, ll. 54–55).

39.     For these reasons, "rapid onset formulation" in the claims of the '695 patent refers to a formulation providing rapid initiation of action after transiting through the stomach as shown by its *in vitro* dissolution profile.

40.     I disagree with Dr. Felton's opinion that the term "onset" necessarily meant the "initiation or start of therapeutic action or effect experienced by the patient after administration of the drug or drug product."  (Felton Declaration, ¶ 8.)

41.     I immediately note that the claims of the '695 patent do not contain a limitation regarding the timing of relief from symptoms.   Furthermore, the specification does not expressly mention any testing or assessment of "relief from symptoms" experienced by a patient.

42.     There is not one, single meaning of the term "onset" in the field of pharmaceutical formulation development either as of June 2001 or as of today; instead, the meaning of the term "onset" depends on its context.

43.     As of June 2001 and still continuing to today, the term "onset" was commonly used in the field of pharmaceutical formulation development to refer to, among other things, the release of ingredients from a drug or dosage form.  Examples of this usage include (emphases added):

- Sangalli, M.E. et al., "In Vitro and In Vivo Evaluation of an Oral System for Time and/or Site-Specific Drug Delivery" J. of Controlled Release 73: 103-110 (2001) (**Sangalli et al. 2001**), Ex. 5 at 103 ("The system consists in a drug-containing core, coated by a

hydrophilic swellable polymer which is responsible for a lag phase in the ***onset of release.***";

- Ødegårdstuen, L.-I. et al., "Characterization of Enteric-Coated Tablets and Pellets by Two *In Vitro* Dissolution Methods and by Scanning Electron Microscopy," Acta Pharm. Nord. 3 (3): 163-170 (1991) (**Ødegårdstuen et al. 1991**), Ex. 6 at 168 ("The holes in the polymer layer will probably affect the ***onset of release*** when pH is increased.");

- Abdou, H., DISSOLUTION, BIOAVAILABILITY, & BIOEQUIVALENCE, 1989 (**Abdou 1989**), Ex. 7 at 456 ("[W]hen the drug is released in large amounts at the ***onset of tablet dissolution*** . . . ."); and

- Macchi, E. et al., "Enteric-coating of Pulsatile-Release HPC Capsules Prepared by Injection Molding," Eur. J. of Pharm. Sci. 70:1-11 (2015) (**Felton et al. 2015**), Ex. 8 at 9 ("Uncoated [Immediate-Release] capsules provided a pulsatile-release performance characterized by a lag time ($t_{10\%}$), due to the dissolution/erosion of the shell, and a pulse time, *i.e.* the time elapsed between ***onset*** and completion ***of release*** ($t_{90-10\%}$) . . . .").

44.     As reflected in the above-cited texts and publications, in the field in 2001 (and to this day) the term "onset" did not necessarily refer to the timing of a patient's relief from symptoms as Dr. Felton suggests but had a variety of meanings depending on the context in which it was used.

45.     I note that the texts cited by Dr. Felton, Aulton, M., PHARMACEUTICS: THE SCIENCE OF DOSAGE FORM DESIGN (1998 & 2002) (**Aulton 1998** and **Aulton 2002**) and Goodman and Gilman, THE PHARMACOLOGICAL BASIS OF THERAPEUTICS, 10th Ed. (2001)

(**Goodman & Gilman 2001**), do not, in my opinion, support her conclusion that the term "onset" can only refer to "initiation or start of therapeutic action or effect experienced by the patient after administration of the drug or drug product."  (Felton Declaration, ¶ 8.)

46.     Instead, as pointed out by Dr. Felton, **Aulton 1998** and **Aulton 2002** expressly define the term "onset" as "the time required to achieve the minimum effective plasma concentration following administration of the dosage form."  **Aulton 1998** at p. 176; **Aulton 2002** at p. 264.  **Aulton 1998** explains:

> It is generally assumed that some minimum concentration of drug must be achieved in the plasma before the desired therapeutic or pharmaceutical effect is achieved.

(*Id.*)

47.     Thus, as recognized by **Aulton 1998** and **Aulton 2002**, the "minimum effective plasma concentration" and "relief from symptoms" are distinct concepts.

48.     I also note that the timing aspect of the Aulton definition of "onset" differs from that of the '695 patent: Aulton measures the time it takes to achieve an effect "following administration [i.e., ingestion] of the dosage form," whereas the '695 patent focuses on the time it takes to achieve an effect once the formulation arrives in the small intestine. **Aulton 1998** at p. 176; **Aulton 2002** at p. 264.

49.     Finally, I note that **Goodman & Gilman 2001** neither defines "onset" nor explains how "onset" was measured. In addition, **Goodman & Gilman 2001** focuses on the pharmacological action of different classes of drugs—how and to what extent they exert their therapeutic and adverse effects—not the design and manufacture of pharmaceutical formulations.

- 13 -

IV.     "DISSOLUTION PROFILE" AND "DISSOLUTION CHARACTERISTICS"

50.     In my opinion, the terms "dissolution profile" and "dissolution characteristics" in the claims of the '695 patent mean the average results of dissolution testing in which the amount of pyridoxine HCl and doxylamine succinate released is measured in 1000 ml phosphate buffer at pH 6.8 and 37° C using a USP (United States Pharmacopeia) type 2 dissolution apparatus at 100 rpm.

51.     The '695 patent states that "any reference to dissolution profile should be construed as referring to the results of a dissolution test in which the amount of pyridoxine HCl and of doxylamine succinate released is measured in 1000 ml phosphate buffer at pH 6.8 and 37° C using a USP (United States Pharmacopoeia) type 2 dissolution apparatus at 100 rpm."  ('695 patent, col. 3, ll. 21-27.)

52.     In my opinion, the above statement specifies the conditions under which dissolution testing should be performed in the context of the claims of the '695 patent.  My interpretation of "results of a dissolution test" in the above statement is that this phrase refers to the average results of a dissolution test, not to individual test runs.

53.     Persons of skill in the field of pharmaceutical formulation development—both in 2001 and today—commonly referred to the average results of a dissolution test using a USP type II dissolution apparatus as the "results of a dissolution test." This is because in June 2001, USP type II dissolution tests were typically run on a machine containing six vessels (corresponding to six runs) and the results for each time point from the individual runs were then averaged.  *See*, for example, Shargel, L. et al., APPLIED BIOPHARMACEUTICS & PHARMACOKINETICS, 4th Ed.

(1999) (**Shargel et al. 1999**), Ex. 9 at p. 141 depicting one such typical USP type II dissolution

testing apparatus containing six vessels.

54.     Other portions of the '695 patent specification also confirm that the terms

"dissolution profile" and "dissolution characteristics" mean average dissolution test results.  It is

the numerical values of the average dissolution test results (not the numerical values of

individual test runs) that are reflected in the numerical values of the claims of the '695 patent.

Similarly, it is the numerical values of average dissolution test results (not the numerical values

of individual test runs) that are used to create the dissolution profiles shown in Figure 1.

55.     Dr. Felton adheres to this custom and practice.  *See*, for example, Pai, M. et al.,

"Clinical Pharmacokinetics of Oral Controlled-Release 5-Fluorocytosine," Antimicrobial Agents

and Chemotherapy 54(3): 1237-41 (2010) (**Felton et al. 2010**), Ex. 11 at 1238–39 (Figure 1

shows the dissolution profile of three formulations based on the mean results of *in vitro*

dissolution testing).

56.     I may be asked to provide background information on these proceedings that will

assist the Court to understand the science and technology relevant to the '695 patent.  At

hearings and/or at trial, I may rely on materials and documents publicly available or produced in

this litigation.  I may also rely on visual aids and demonstrative exhibits that I may prepare or

have prepared.  I reserve the right to supplement or amend the foregoing as appropriate, if I

become aware of any additional pertinent information, or in response to the testimony,

declaration, reports or analyses of other witnesses, including other expert witnesses who many

testify in this matter.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 3rd day of August.

Stephen R. Byrn, Ph.D.