IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DUCHESNAY INC. and DUCHESNAY USA INC.,

Plaintiffs,

v.

ACTAVIS LABORATORIES FL, INC., ACTAVIS, INC., and ACTAVIS PHARMA, INC.,

Defendants.

C.A. No. 14-912 (SLR)(SRF)

REDACTED PUBLIC VERSION FILED 8/20/15

**PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF**

OF COUNSEL:

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Barbara R. Rudolph
Barry W. Graham
Danielle A. Duszczyszyn
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Alissa K. Lipton
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
Two Seaport Lane
Boston, MA 02210-2001
(617) 646-1600

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
Derek J. Fahnestock (#4705)
Stephen J. Kraftschik (#5623)
Thomas Curry (#5877)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
mgraham@mnat.com
dfahnestock@mnat.com
skraftschik@mnat.com
tcurry@mnat.com
*Attorneys for Duchesnay Inc. and Duchesnay USA Inc.*

August 3, 2015

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

I. INTRODUCTION ..... 1

II. COUNTER-STATEMENT OF FACTS ..... 2

III. ARGUMENT ..... 4

A. "Rapid Onset Formulation" ..... 4

1. Actavis's Proposed Construction Is Inconsistent With The '695 Patent Claims And Specification ..... 7

a. The Claimed Formulations Are An Important Advance Over The Prior Art ..... 10

B. "Dissolution Profile / Dissolution Characteristics" ..... 11

IV. CONCLUSION ..... 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)........................................................................................ 5-6

*Raytheon Co. v. Roper Corp.*,
724 F.2d 951 (Fed. Cir. 1983)..........................................................................................11

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015)..........................................................................................................4

*Virnetx, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)..........................................................................................4

Pursuant to the Court's Scheduling Order (D.I. 16), as amended, Plaintiffs Duchesnay Inc. and Duchesnay USA Inc. (collectively "Duchesnay") submit this reply claim construction brief.

## I. INTRODUCTION

Actavis asks this Court to construe the term "rapid onset formulation" to mean a formulation providing "rapid initiation of action (i.e., relief from symptoms)" after transiting through the stomach. In support of its proposed construction, Actavis and its expert rely on treatises to assert that there is a single, art-recognized meaning of the term "onset" in the field of pharmaceutical formulation development that is tied to the timing of relief from symptoms experienced by patients. But Actavis's evidence fails to establish any such single, established meaning that ties the word "onset" to a perceived "relief from symptoms" and is therefore neither dispositive nor persuasive. More importantly, the meaning of the term "rapid onset formulation" has to be assessed in the context of the intrinsic evidence, which in this case demonstrates a clear reliance on dissolution profile, not relief from symptoms.

The parties apparently agree that the ultimate goal of the claimed formulations is to provide rapid relief from the debilitating effects of nausea and vomiting, after the claimed drug formulation has passed through the stomach unscathed and the active ingredients then become available for absorption in the intestines. The parties differ, however, with respect to the parameter that should be used to assess whether a formulation qualifies as "rapid onset." Actavis, urging the Court to construe the term based on the timing of relief of symptoms experienced by the patient, ignores the context and focus of the '695 patent which makes clear that a "rapid onset formulation" is a formulation providing rapid initiation of action after transiting through the stomach *as shown by its in vitro dissolution profile*. The '695 patent is replete with information and data pertaining to dissolution profiles, not the assessment of patient responses. The rapid

dissolution profile of the claimed formulations is rightly the focus of the specification and claims, as it is what ensures the rapid influx of drug into the bloodstream.

Actavis's position that the terms "dissolution profile" and "dissolution characteristics" should be construed to include individual test runs in addition to average dissolution test results is equally flawed. Actavis does not (nor could it) contend that the plain meaning of these terms to a person of skill in the art would mean individual dissolution test runs. Instead, Actavis attempts to point to an allegedly limiting definition of these terms in the patent specification. Contrary to Actavis's assertion, the passage in the specification that Actavis relies on serves to identify the *conditions* of the dissolution test. But the reference to the *results* of the dissolution test relies upon the well-known understanding of a person of ordinary skill in the art that a dissolution "profile" or "characteristics" refers to an average value. Consistent with the plain meaning of these terms to a person of skill in the art, the dissolution profiles of the claimed compositions are presented as averages in Figure 1 and Tables 3 and 6 in the '695 patent specification. It is these average results that are reflected in the numerical values in the claims of the '695 patent.

Accordingly, these terms should be construed consistent with their usage in the specification and their plain meaning to one of skill in the art as explained in Duchesnay's Opening Claim Construction Brief.

## II.     COUNTER-STATEMENT OF FACTS

As discussed in Duchesnay's Opening Brief, the claimed doxylamine succinate and pyridoxine HCl ("DS-P") formulations provide a safe and effective treatment for patients suffering from nausea and vomiting. [D.I. 39, "Pl. Opening Br." at 1, 3–4.] DS-P formulations contain a synergistic combination of the two active ingredients, doxylamine succinate ("DS") and pyridoxine hydrochloride ("P"). [D.I. 38, Ex. 1, '695 patent at 1:5–9.] They are provided as enterically-coated tablets to ensure that the dosage form passes through the stomach before

releasing the two active ingredients in the small intestines. [Byrn Decl., ¶ 28; D.I. 38, Ex. 1 at 2:65–3:2; 3:29–34; 4:64–67.] This helps ensure that both active ingredients will be absorbed from the small intestines at the same time, to avoid the dissolution of one active ingredient to the detriment of the other and to ensure the synergistic effect of having sufficiently high levels of both doxylamine succinate and pyridoxine in the bloodstream at the same time. [D.I. 38, Ex. 1 at 1:63-2:5.]

The inventor of the patent-in-suit, Mr. Eric Gervais, discovered that the prior art DS-P formulation Diclectin® suffered from a particularly slow dissolution profile under conditions that simulate the conditions of the small intestines. [1:28–31; Example 3.] Mr. Gervais invented a class of formulations that have a much faster dissolution profile, indicative of a more rapid therapeutic action. [7:32–38.]

The relationship between dissolution profile and onset of therapeutic activity would have been readily apparent to one of skill in the art. [Byrn Decl., ¶ 31.] The relationship is straightforward: the faster the dissolution, the faster absorption can take place, and the faster the onset of therapeutic effect can occur. [Byrn Decl., ¶ 31.] One of skill in the art would have understood that, when comparing different formulations of equal amounts of the same soluble, readily absorbed drug, a faster dissolution rate will necessarily translate into a more rapid influx of drug into the bloodstream, and thus faster onset of action. [Byrn Decl., ¶ 33.] Furthermore, one of skill in the art would have known, as of 2001, that both active ingredients of the claimed formulations, doxylamine succinate and pyridoxine hydrochloride, are readily soluble in water and are readily absorbed in the small intestines. [Byrn Decl., ¶ 32; **Merck Index 2001**, Ex. 1 at 3479, 8075 (noting that doxylamine succinate and pyridoxine hydrochloride are water soluble); **Remington 1995**, Ex. 2 at 1127, 1226 (same); REMINGTON: THE SCIENCE AND PRACTICE OF

PHARMACY, 20th Ed. (2000) (**Remington 2000)**, Ex. 3 at 1469, 1809–10 (same); **Bishai 2000**, D.I. 48, Ex. 3 at 140 (noting both doxylamine succinate and pyridoxine HCl are readily absorbed in the intestines).] Therefore, the rates of release and dissolution, which are formulation-specific characteristics, are what determine the rate of absorption of the active ingredients, which in turn affects how rapidly blood plasma concentrations of the active ingredients rise. [Byrn Decl., ¶ 33; **Ansel 1999**, Ex. 4 at 113–15.]

The ’695 patent relies upon this well-known relationship between dissolution and blood levels, and therefore ties the rapid onset of action to the fast dissolution of the claimed formulation when it reaches the site of dissolution and absorption, i.e., the intestines. [Byrn Decl. ¶¶ 29–30.] Duchesnay’s construction of the term “rapid onset formulation” captures this concept and thus more naturally aligns with the plain meaning of the term, when read in the context of the ’695 patent from the perspective of one of ordinary skill in the art of pharmaceutical formulation development.

## III. ARGUMENT

### A. “Rapid Onset Formulation”

Actavis relies on expert opinion and treatises to argue that “rapid onset formulation” in the field of pharmaceutical formulation development can only mean a formulation providing a rapid “relief from symptoms” after transiting through the stomach. Contrary to Actavis’s assertion, in the field of pharmaceutical formulation development, there is no single, art-recognized usage of the term “onset.”[1] [Byrn Decl. ¶¶ 40–49.] Both in 2001 and today, the

---

[1] Despite Actavis’s discourse on claim construction legal principles, the Supreme Court’s recent decision in *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015), did not alter the well-settled law that when construing claims, “courts are permitted to consider extrinsic evidence like expert testimony, dictionaries, and treatises, [but] such evidence is generally of less significance than the intrinsic record.” *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d

(Continued . . .)

meaning of the term "onset" in the field of pharmaceutical formulation development depends on context. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (reliance on treatises and their definitions "focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent"). For example, the term "onset" can refer to the timing of release or dissolution of a drug's ingredients. *See* Byrn Decl. ¶¶ 43–44; **Sangalli et al. 2001**, Ex. 5 at 103 ("The system consists in a drug-containing core, coated by a hydrophilic swellable polymer which is responsible for a lag phase in the *onset of release*." (emphasis added)); **Ødegårdstuen et al. 1991**, Ex. 6 at 168 ("The holes in the polymer layer will probably affect the *onset of release* when pH is increased." (emphasis added)); **Abdou 1989**, Ex. 7 at 456 ("[W]hen the drug is released in large amounts at the *onset of tablet dissolution* . . . ." (emphasis added)). In none of these contexts, however, is "onset" tied to the timing of a patient's relief from symptoms.

In fact, Actavis's expert Dr. Linda Felton cannot credibly maintain that "onset" can only refer to the timing of a patient's relief from symptoms when she authored a publication in which the word "onset" was used in conjunction with drug release without any mention of the timing of a patient's relief from symptoms. [Byrn Decl. ¶ 43; **Felton et al. 2015**, Ex. 8 at 9 ("Uncoated [Immediate-Release] capsules provided a pulsatile-release performance characterized by a lag time ($t_{10\%}$), due to the dissolution/erosion of the shell, and a pulse time, *i.e.* the time elapsed between *onset* and completion *of release* ($t_{90-10\%}$) . . . ." (emphasis added)).] Even the Aulton texts, attached as Exhibit 5 to Actavis's brief, refer to attainment of minimum effective concentration but do not specifically link "onset" to "relief from symptoms" experienced by

(. . . continued)
1308, 1316 (Fed. Cir. 2014) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005)).

patients. [Byrn Decl. ¶¶ 46–47.] It is also worth noting that the timing aspect of the Aulton definition differs from that of the ’695 patent: Aulton measures the time it takes to achieve an effect “following administration [i.e., ingestion] of the dosage form,” whereas the ’695 patent focuses on the time it takes to achieve an effect once the formulation arrives in the small intestine. [Byrn Decl. ¶ 48; **Aulton 1998** at 176; **Aulton 2000** at 264.]

The Goodman & Gilman reference, Exhibit 6 to Actavis’s brief, neither defines “onset” nor explains how “onset” was measured. [Byrn Decl. ¶ 49.] Moreover, Goodman & Gilman focuses on the pharmacological action of different classes of drugs—how and to what extent they exert their therapeutic and adverse effects—not the design and manufacture of pharmaceutical formulations. [Byrn Decl. ¶ 49.] Finally, while Duchesnay’s label for Diclegis® refers to “onset of action,” it is telling that the passage quoted by Actavis refers, not to patient assessment of symptoms, but instead to “reduction of absorption.” [D.I. 47, “Def. Br.” at 12 (citing Diclegis® label at 5).]

Therefore, the extrinsic evidence relied on by Actavis is not persuasive and does not resolve the parties’ dispute concerning the meaning of the term “rapid onset formulation” in the ’695 patent. Instead, the correct meaning of “rapid onset formulation” should and can be readily gleaned from the intrinsic evidence, from the vantage point of a person of ordinary skill in the art.[2] *See Phillips*, 415 F.3d at 1322 (intrinsic evidence is elevated over extrinsic evidence such as

---

[2] Duchesnay submits that one of ordinary skill in the art is a person having knowledge of pharmaceutical formulation and drug delivery systems, who has a Ph.D., a Pharm.D., a Master’s degree, or a Bachelor’s degree in pharmacy or a related science and some years of experience in pharmaceutical formulation. One of skill in the art would have knowledge of pharmaceutics, including knowledge of delayed and immediate release dosage forms, enteric coatings, basic pharmacokinetics, and dissolution testing. He or she would also know that for oral dosage forms, drug dissolution at the intended delivery site is a prerequisite to the uptake of drug into the blood stream and its subsequent transport to the receptor site in patient’s body.

treatises, because "[t]here is no guarantee that a term is used in the same way in a treatise as it would be by the patentee.").

#### 1. Actavis's Proposed Construction Is Inconsistent With The '695 Patent Claims And Specification

Actavis argues that the specification "*implicitly* defines 'onset' as relief from symptoms." [Def. Br. at 11.] But the specification provides a much more explicit definition, which Actavis conveniently ignores. For example, Actavis ignores the fact that the specification of the '695 patent does not focus on patient responses but instead discusses the relationship between the rapid dissolution profiles of the claimed formulations and onset of action: "[t]he novel formulations, as depicted by examples 1 and 2, show markedly faster onset dissolution profiles resulting in a rapid onset of action." [D.I. 38, Ex. 1 at col. 8:55–57; Byrn Decl. ¶¶ 26–27, 34–39.] Indeed, the patent repeatedly ties the improved dissolution profile of the claimed formulations to "rapid onset" of action:

- "[T]he formulation exhibiting a dissolution profile indicative of a rapid onset." [2:10–12];
- "The invention also seeks to provide a pharmaceutical composition having specific in-vitro dissolution profiles indicative of rapid onset of the active ingredients." [2:13–15];
- "The first dissolution profile (example 1) corresponds to a rapid onset formulation from which nearly 100% of both active ingredients is released within 45 minutes. The second dissolution profile (example 2) corresponds to a rapid onset formulation from which approximately 95% of both active ingredients is released within 120 minutes." [2:30–36];
- "This example [Example 2] demonstrates that the rapid onset feature of the formulation of the present invention was obtained with a different group of excipients." [6:33–35; *see also* 7:5–39, showing improved dissolution characteristics.]
- "[T]he novel formulation demonstrates a rapid onset as shown by its dissolution profile." [7:32–34]; and

- "A slower in-vivo dissolution profile is indicative of a delayed onset of action." [8:54–55].

The rapid onset of action of the claimed formulations is directly attributable to improved dissolution characteristics. In contrast, there is nothing in the '695 patent specification that provides for any measure of the timing of relief from symptoms that patients experience.

Actavis nevertheless argues that "rapid onset formulation" should be construed to mean a formulation providing rapid "relief from symptoms" because the patentee allegedly represented to the PTO that the primary benefit of the invention was "overcoming the delayed onset of Diclectin to provide 'urgent relief of symptoms.'" [Def. Br. at 8, 9–11.] In support of its argument, Actavis points to the following statements in the specification:

> The main challenge surmounted by the present invention was to arrive at a dosage form capable of overcoming the drawbacks of the prior art . . . .

[D.I. 38, Ex. 1 at col. 1:63–66.]

> The current formulation [*i.e.*, the prior Diclectin®] suffers from drawbacks, one of which being its delayed onset of action. However, the [prior Diclectin®] once ingested, can take more than 4 hours before the two active ingredients (pyridoxine HCl and doxylamine succinate) reach nearly full dissolution in the small intestines, where it is absorbed. This delay is often considered too long for patients, such as women suffering from NVP, who require urgent relief of symptoms.

[*Id.* at col. 1:28–34.]

But a careful reading of this passage again makes clear that the delay referred to here is slow dissolution of the prior Diclectin® formulation, which in turn affects therapeutic efficacy. The more rapid onset is unquestionably provided (and measured) by the faster dissolution

profile, and thus the drawback was overcome.[3] Consistent with Duchesnay's proposed construction of "rapid onset formulation," the '695 patent places the focus of the invention squarely on the rate at which the active ingredients dissolve once the drug reaches the small intestine. The last sentence above simply acknowledges that dissolution, absorption, and the achievement of therapeutic blood levels are a pre-requisite to relief of symptoms.

Actavis is incorrect that Duchesnay's proposed construction reads the term "onset" out of the claims because it refers to rapid release without regard to when the release begins. [Def. Br. at 12; *see also id.* at 13 (alleging that Duchesnay's proposed construction "ignores starting time entirely.").] Duchesnay's construction makes clear that the onset of action commences once the formulation reaches the intestines, as shown by its dissolution profile in pH 6.8, the pH of the upper portion of the small intestines where absorption is most efficient.

For this reason, Actavis is also incorrect that Duchesnay's construction is "open to formulations that dump the active ingredients within minutes after delaying initial release for five or more hours." [Def. Br. at 13.] Not so. A formulation that delays dissolution of the active ingredients for five or more hours after the drug reaches the small intestine would not be considered to be a formulation that "rapidly releases" the active ingredients upon reaching the small intestine. Moreover, the specific dissolution characteristics set forth in the body of the claims would preclude such a formulation.

Actavis also argues that "rapid onset formulation" cannot refer to a formulation that rapidly releases the active ingredients in the small intestine as shown by a formulation's *in vitro* dissolution profile because both the claimed formulations and the prior Diclectin® show some

---

3 The '695 patent refers to several drawbacks of the prior Diclectin® formulation, including the inclusion of lactose and the large pill size, and concludes that the claimed formulations "overcome most, if not all of the drawbacks associated with the prior art." [D.I. 38, Ex. 1 at col. 8:57-59].

dissolution at the 15 minute time point in an *in vitro* dissolution test and thus do not start to dissolve at different times.[4] [Def. Br. at 13 (citing Tables 6 and 9 of the '695 patent at the 15 minute time point).] But the formulation of Example 2 is a "rapid onset formulation" because as shown by the percent of dissolution at the 15 minute and other time points, the dissolution rate of active ingredients is faster for the formulation of Example 2 as compared to the prior Diclectin®. Significantly, it is the faster rate of dissolution, as shown by the dissolution profile, that ultimately translates into a faster attainment (i.e., more rapid onset) of therapeutic blood plasma levels.

Finally, Duchesnay's proposed construction does not merely "parrot" claim language already recited by the body of the claim as Actavis contends. [Def. Br. at 14.] Duchesnay's proposed construction means what it says: a "rapid onset formulation" is a formulation providing rapid initiation of action, after transiting through the stomach, as shown by its *in vitro* dissolution profile.

**a. The Claimed Formulations Are An Important Advance Over The Prior Art**

Actavis resorts to arguing the *in vitro* dissolution profiles for the claimed formulations of the '695 patent are "highly similar," "highly comparable," or "very close" to the *in vitro* dissolution profiles for the prior Diclectin® or that they lack practical utility under Duchesnay's construction. [Def. Br. at 5, 10.][5] As shown in Figure 1, however, the *in vitro* dissolution profiles

4 The values reported at the 15 minute time point in Tables 6 and 9 are *not* the same. Table 6 (corresponding to the novel formulation of Example 2) reports that 21% and 32% of pyridoxine HCl and doxylamine succinate respectively are dissolved at the 15 minute time point, whereas Table 9 (corresponding to the prior Diclectin® of Example 3) reports that only 13% and 14% of pyridoxine HCl and doxylamine succinate respectively are dissolved at the 15 minute time point.

5 On page 5 of its brief, Actavis compares the numerical values in claim 1 of the '695 patent to values obtained from a particular dissolution test run (Run 3) of the prior Diclectin® that is reported in Table 9 of the '695 patent. But Run 3 is an outlier that exhibits faster dissolution as

(Continued . . .)

for the novel formulations of the ’695 patent are significantly faster than the *in vitro* dissolution profiles for the prior Diclectin®. [Byrn Decl. ¶¶ 21–25, 36.]

As for practical utility, the ’695 patent unquestionably describes a practical utility for the claimed formulations—as evidenced by Actavis’s attempt to seek approval to market a generic version of Diclegis®, Duchesnay’s commercial embodiment of the ’695 patent. *See, e.g, Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 959 (Fed. Cir. 1983) (“If a party has made, sold, or used a properly claimed device, and has thus infringed, proof of that device’s utility is thereby established. People rarely, if ever, appropriate useless inventions.”). Actavis does not dispute that the ’695 patent describes formulations useful for the treatment of nausea and vomiting of pregnancy. The patent statute requires nothing more. *Id.* at 958–59 (“When a properly claimed invention meets at least one stated objective, utility under § 101 is clearly shown.”).

**B. “Dissolution Profile / Dissolution Characteristics”**

The terms “dissolution profile” and “dissolution characteristics” would have been understood by a person of ordinary skill in the art to mean the *average* results of dissolution testing, thus reflecting the natural variability of the test. Actavis does not (and cannot) contend otherwise. The specification of the ’695 patent confirms Duchesnay’s proposed construction (and is consistent with the plain meaning of these terms to one of skill in the art) because the only dissolution profiles disclosed in the specification are based on the average results of dissolution testing obtained at each time point. [Byrn Decl. ¶ 54.] Each of Examples 1–3 of the ’695 patent report average values (based on six individual runs) for each time point and it is those average

---

(. . . continued)
compared to the other dissolution test runs of the prior Diclectin® or the average reported values for each time point. Notably, even Actavis’s cherry-picked values do not fall within any of the claims of the ’695 patent. In any event, as discussed below, the more meaningful values are the average dissolution test results, not the results of an individual test run.

values that are incorporated into the claims and that are used to create the dissolution profiles depicted in Figure 1. [*Id.*]

According to Actavis, the ’695 patent expressly defines “dissolution profile” to mean individual test runs in the following statement:

> In the present invention, any reference to dissolution profile should be construed as referring to the results of a dissolution test in which the amount of pyridoxine HCl and of doxylamine succinate released is measured in 1000 ml phosphate buffer at pH 6.8 and 37º C, using a USP (United States Pharmacopeia) type 2 dissolution apparatus at 100 rpm; preferably measured by high performance liquid chromatography.

[D.I. 38, Ex. 1 at col. 3: 21–28.] Although this statement specifies the *conditions* under which dissolution testing should be performed, it does not mean that individual test runs should be included within the meaning of the terms “dissolution profile” and “dissolution characteristics.” [Byrn Decl. ¶¶ 50–53.] Furthermore, while the patent specification may discuss reasons why individual runs are outliers compared to the rest, it does not thereby alter the well-recognized usage of the terms “dissolution profile” and “dissolution characteristics” to somehow refer to both individual and average results. While Actavis interprets “results of a dissolution test” to refer to individual test runs, a more reasonable interpretation in view of the plain meaning of the terms and the remainder of the specification is that the phrase refers to the average results of a dissolution test. [*Id.*]

The ’695 patent specification is consistent with standard practice which was and is to perform multiple dissolution test runs and to average the results. [Byrn Decl., ¶¶ 50–53; **Shargel et al. 1999**, Ex. 9 at 141 (showing a USP type II apparatus, the Distek 2000, with six vessels).] And while individual results of dissolution test runs may be reported, it was not in 2001—or today—standard practice to simply perform one dissolution test run and rely on the numerical value obtained.

[REDACTED]

[REDACTED] Even Actavis's expert witness adheres to this custom and practice. [*See, e.g.*, **Felton et al. 2010**, Ex. 11 at 1238–39 (Figure 1 shows the dissolution profile of three formulations based on the mean results of *in vitro* dissolution testing); Byrn Decl. ¶ 55.]

There can be no ambiguity as to the meaning of dissolution profile or dissolution characteristics based on the portion of the specification relied on by Actavis, because the remainder of the '695 patent specification—including the numerical values incorporated into the patent claims and used to create the dissolution profiles of Figure 1—confirms that consistent with their plain meaning the terms "dissolution test results" and "dissolution characteristics" mean the average results of a dissolution test, not to individual test runs.

## IV. CONCLUSION

For the foregoing reasons, Duchesnay respectfully requests that the Court construe the terms "rapid onset formulation" and "dissolution profile" / "dissolution characteristics" in the manner proposed by Duchesnay.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Stephen J. Kraftschik*

Mary B. Graham (#2256)
Derek J. Fahnestock (#4705)
Stephen J. Kraftschik (#5623)
Thomas Curry (#5877)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
mgraham@mnat.com
dfahnestock@mnat.com
skraftschik@mnat.com
tcurry@mnat.com
*Attorneys for Duchesnay Inc. and Duchesnay USA Inc.*

OF COUNSEL:

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Barbara R. Rudolph
Barry W. Graham
Danielle A. Duszczyszyn
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Alissa K. Lipton
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Two Seaport Lane
Boston, MA 02210-2001
(617) 646-1600

August 3, 2015
9342433